UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**MARY K. SOMOGYE**,                                 Case No. 3:11 CV 496

           Plaintiff,                              Magistrate Judge James R. Knepp, II

     v.                                          MEMORANDUM OPINION AND ORDER

**TOLEDO CLINIC, INC.**,

           Defendant.

### INTRODUCTION

Plaintiff Mary K. Somogye is a Registered Nurse who was employed by Defendant Toledo Clinic, Inc. as a Clinical Affiliate in their Cardiology Department from October 2000 until March 2010. Among a number of state tort law claims, she alleges Defendant discriminated against her based on age and based on her association with a disabled person.

Initially, Plaintiff filed this case in the Lucas County Court of Common Pleas. Defendant removed the case to this District Court, which has jurisdiction under 28 U.S.C. § 1331. The parties have consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 8). Plaintiff alleges six causes of action:

1.      Age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 et seq;

2.      Discrimination based on Plaintiff's association with a disabled person, under the Americans with Disabilities Act (ADA and ADAAA), 42 U.S.C. §§ 12101 et seq;

3.      Intentional infliction of emotional distress (IIED);

4.      Negligent hiring, retention, and supervision;

5.      Defamation; and

6.      Invasion of privacy.

Defendant filed a Motion for Summary Judgment on all counts. (Doc. 20). Plaintiff filed an Opposition (Doc. 23), and Defendant filed a Reply (Doc. 27). For the reasons explained below, the Court grants Defendant's Motion for Summary Judgment.

## BACKGROUND

Plaintiff is a Registered Nurse and was employed as a Clinical Affiliate in Defendant's cardiology department from October 2000 until Defendant terminated her employment in March 2010. (Doc. 20-1, at 8–9, 72–76). The majority of the time, Plaintiff did not work on Defendant's grounds, but rather worked alongside physicians at Flower Hospital and Toledo Hospital. (Doc. 20-4, at 14–15; Doc. 20-5, at 10). Plaintiff's job duties included assisting physicians in patient care and education and writing progress notes for the physicians. (Doc. 20-2; Doc. 20-1, at 26; Doc. 20-5, at 25). In the course of her job, Plaintiff commonly accessed medical records to review labs, data, and other diagnostic test results ordered by physicians. (Doc. 20-2; Doc. 20-5, at 25). Plaintiff's employment with Defendant was as an at-will employee, allowing either she or Defendant to terminate the employment relationship at any time. (Doc. 20-1, at 39; Doc. 20-12). Plaintiff acknowledged this both by signing the employee handbook (Doc. 20-12) and through her deposition testimony (Doc. 20-1, at 39).

To protect patient privacy, Defendant requires its employees to adhere to a confidentiality policy. The original policy Plaintiff signed when she began working for Defendant in 2000 stated:

> I . . . agree that I will not seek or obtain information regarding a patient which is not required in the performance of my duties. I understand that accepting and abiding by this pledge of confidentiality is a condition of my employment and any violation of this pledge shall be cause for my immediate dismissal.

2

(Doc. 20-6; Doc. 20-7). Ultimately, when the Health Insurance Portability and Accountability Act (HIPAA) went into effect the policy was updated to state: "I will not access or view any information other than what is required to do my job. If I have any question about whether access to certain information is required for me to do my job, I will immediately ask my supervisor for clarification." (Doc. 20-9; Doc. 20-10). The policy further provided: "I understand that violation of this Agreement may result in disciplinary action, up to and including termination of my employment". (Doc. 20-9, 20-10). The record shows Plaintiff signed and acknowledged these policies on four separate occasions during her employment with Defendant. (Doc. 20-6; Doc. 20-7, Doc. 20-9; Doc. 20-10).

Defendant has a corrective action policy outlining its disciplinary process. (Doc. 20-13). This policy establishes a general plan for progressive discipline, but reserves to management the right to skip over or bypass any steps in the process. (Doc. 20-13). Further, the policy states: "How rapidly an employee goes through the following steps or at what stage the corrective action is initiated depends upon the seriousness of the offense involved and the length of time since the last violation." (Doc. 20-13).

The specific events leading to Plaintiff's termination began when the Toledo Hospital privacy officer, Sandy Lewallen, received an anonymous complaint of a HIPAA violation. (Doc. 20-4, at 12). Her investigation revealed Plaintiff had accessed medical records of two patients not being treated by the physicians for whom she worked. (Doc. 20-4, at 12). On March 24, 2010, Lewallen reported this information to Sue Ann Lancaster, Defendant's director of compliance. (Doc. 20-4 at 8, 12).

Lancaster then conducted her own investigation. (Doc. 20-4, at 12). Upon checking the records, the computer systems revealed the patients were not patients in the cardiology department,

but showed Plaintiff had nevertheless accessed their medical records. (Doc. 20-4, at 12). In fact, computer records showed Plaintiff had accessed one of the patient's records at least 44 times and the other patient's records at least 28 times. (Doc. 23-3, at 21). Lancaster looked further, but found no guardianship papers, HIPAA releases, or power of attorney releases connecting Plaintiff to the patients' medical records. (Doc. 23-3, at 21–13; Doc. 27-3).

When she had completed her investigation, Lancaster contacted Defendant's director of human resources, Steve Hammer, to discuss how to proceed. (Doc. 20-4, at 15). Hammer examined the situation from a human resources perspective and discussed it with local counsel to make sure Defendant proceeded correctly. (Doc. 20-15, at 7). Lancaster contacted Plaintiff's direct supervisor, Peggy Trapp, to arrange for Plaintiff to attend a meeting with human resources. (Doc. 20-5, at 10). Trapp informed Plaintiff about the meeting, which was held later that day. (Doc. 20-1, at 71–72; Doc. 20-4, at 16; Doc. 20-5, at 11; Doc. 20-15, at 8).

Prior to the meeting, Plaintiff was introduced to Hammer. (Doc. 20-1, at 72). She cannot recall whether she had met him previously, but says he was an unfamiliar face and she had little if any interaction with him prior to the March 24, 2010 meeting. (Doc. 20-1, at 72–73). In addition to Plaintiff and Hammer, Lancaster and Trapp also attended the meeting. (Doc. 20-1, at 73).[1] Lancaster introduced everyone in the room and asked Plaintiff if she had ever accessed two particular patients' medical records. (Doc. 20-1, at 74). Plaintiff said she had. (Doc. 20-1, at 74). Lancaster asked her if she knew the two patients. (Doc. 20-4, at 17). Plaintiff explained the two people were her mother and sister, and claims she told Lancaster she had power of attorney and a HIPAA release for her

---

1.  Throughout Plaintiff's deposition, Lancaster was incorrectly referred to as "Lewallen." The mistake was ultimately caught and corrected. (Doc. 20-1, at 80).

4

mother and guardianship over her sister. (Doc. 20-1, at 74; Doc. 23-1, at paragraphs 6–7). Plaintiff's adult sister has Downs Syndrome and resided with Plaintiff during the events giving rise to this litigation. (Doc. 20-1, at 12, 74). Her mother has Parkinson's, takes a number of medications, and frequently falls. (Doc. 20-1, at 20–21). Plaintiff referenced her family members' medical problems when explaining why she had accessed their medical records. (Doc. 20-1, at 20–21, 74).

Lancaster asked Plaintiff if she had needed the information to perform her job, and she stated she had not – a statement Plaintiff acknowledged in her deposition. (Doc. 20-4, at 18; Doc. 20-1, at 77). Lancaster asked if Plaintiff's mother and sister were cardiology department patients. (Doc. 20-1, at 74; Doc. 20-15, at 12). Although Plaintiff said they were, hospital records indicated otherwise. Neither person had been in the cardiology department for over a year. (Doc. 20-1, at 74, Doc. 20-15, at 12).

Once Plaintiff had told her story, it was clear to Lancaster and Hammer she had violated Defendant's confidentiality policy. (Doc. 20-4, at 18–19; Doc. 20-15, at 9). They informed her that she had violated company policy and terminated her employment by executing termination paperwork already there for the meeting. (Doc. 20-4, at 19; Doc. 20-15, at 9). Pursuant to Defendant's policy for involuntarily terminated employees, they informed Plaintiff she could no longer step foot on Defendant's grounds unless as a patient or accompanying a patient, and could not apply for employment anywhere in the ProMedica Healthcare System (and possibly Mercy Health Partners). (Doc. 27-4; Doc. 20-1, at 75; Doc. 20-4, at 22–23). After Plaintiff signed termination paperwork, Trapp told her the decision had not come from the cardiology department physicians. (Doc. 20-1, at 76).

Defendant did not hire a replacement Clinical Affiliate after it terminated Plaintiff. (Doc. 20-

5

5, at 17–18; Doc. 20-15, at 38). Plaintiff does not believe anyone replaced her. (Doc. 20-1, at 98). Instead, Plaintiff's former job duties have mainly been absorbed by the cardiology department physicians. (Doc. 20-15, at 39). Additionally, Terri Liewert, a per diem employee, fills in as a Clinical Affiliate when she has time off from her full-time job. (Doc. 20-15, at 38). But although Plaintiff worked anywhere from 38 to 50-plus hours a week, Liewert worked no more than 120 hours total in 2011 and not much more than that in 2010. (Doc. 20-15, at 38).

Following Plaintiff's termination, she sent a document to the EEOC detailing her position and the EEOC issued her a right to sue letter. (Doc. 20-18; Doc. 1-1, at paragraph 4). Ultimately, she sued Defendant for age and disability discrimination, along with various tort law claims. Defendant now moves for summary judgment on all counts. (Doc. 20).

**STANDARD OF REVIEW**

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id.* When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**ANALYSIS**

<u>Age Discrimination Claim</u>

ADEA makes it "unlawful for an employer to . . . discharge any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1). Plaintiffs can establish ADEA violations through either direct or circumstantial evidence. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). When, as here, the plaintiff does not allege direct evidence of discrimination, "[t]he three-step framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and modified by *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981), guides the analysis of age discrimination claims based upon circumstantial evidence."  *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811–12 (6th Cir. 2011).

First, the *McDonnell Douglas* burden shifting analysis requires the plaintiff to establish a prima facie case of age discrimination. *Id.* at 812. If the plaintiff satisfies this burden, the burden of production shifts to the defendant to articulate "some legitimate, nondiscriminatory reason for the adverse employment action at issue." *Id.* Finally, the burden shifts back to the plaintiff to show the defendant's proffered reason is merely a pretext to mask discrimination. *Id.* The Supreme Court has emphasized that at all times, the ultimate burden of persuasion remains on the plaintiff to prove age was the but-for cause of the adverse employment action. *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343, 2351 (2009).

*Plaintiff's Prima Facie Case*

To establish a prima facie case of age discrimination, Plaintiff must show (1) she was over 40 years old, (2) she was subject to an adverse employment action, (3) she was qualified for the position, and (4) either she was replaced by someone outside the protected class, or similarly

7

situated employees outside the protected class were treated more favorably. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002).

Defendant does not dispute Plaintiff's ability to satisfy the first two prongs of her prima facie case. (Doc. 20, at 7). Neither does Defendant argue Plaintiff was unqualified for the position of Clinical Affiliate. (Doc. 20, at 7). Rather, Defendant argues Plaintiff cannot establish the fourth prong of her prima facie case. (Doc. 20, at 7). To satisfy her prima facie burden, Plaintiff must show Defendant replaced her with a substantially younger employee or that younger, similarly situated employees were treated more favorably than Plaintiff.

## *Replacement*

Plaintiff claims a former co-worker, Terri Liewert, took on some of her duties. (Doc. 20-1, at 97–99), but "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among existing employees already performing related work."  *Love v. Elec. Power Bd. of Chattanooga*, 392 Fed. Appx. 405, 408 (6th Cir. 2010). When Plaintiff worked for Defendant, she worked anywhere from 38 to 50-plus hours a week. (Doc. 20-1, at 98). Liewert, on the other hand, is no longer even a full-time employee for Defendant. (Doc. 20-1, at 97). Although she was previously a Clinical Affiliate, Liewert left Defendant for a full-time position elsewhere but stayed on "per diem" status with Defendant, meaning she would fill in every now and then on her days off from her new employer. (Doc. 20-1, at 97). Liewert did not work for Defendant every week (Doc. 20-5, at 18) and when she did she could only fill in when she was not working her full-time job. Evidence suggests she worked no more than 120 hours for Defendant in 2011 and not much more than that in 2010. (Doc. 20-15, at 38).

8

Plaintiff has provided no evidence indicating Defendant hired any replacement for Plaintiff's position. Defendant has not hired another Clinical Affiliate. (Doc. 20-5, at 18; Doc 20-15, at 38). Liewert fills in when she can, but "the doctors are just assuming [Plaintiff's] duties themselves." (Doc. 20-15, at 39); *see Love*, 392 Fed. App'x at 408 ("a person is not replaced when ... the work is redistributed among existing employees"). Even Plaintiff acknowledges Liewert is a per diem employee who only fills in when she has time off from her full-time job, and Plaintiff has said she does not believe anyone replaced her when she was terminated. (Doc. 20-1, at 98). In short, Plaintiff cannot prove Defendant replaced her with a substantially younger employee because Defendant never replaced Plaintiff at all.

*More Favorable Treatment of Younger, Similarly Situated Employees*

Plaintiff claims she can establish the fourth prong of her prima facie case because younger, similarly situated employees were treated more favorably for confidentiality policy violations than she was. (Doc. 23, at 4–5). Particularly, she supports her argument by suggesting younger employees were offered progressive discipline rather than being terminated for confidentiality policy and HIPAA violations. (Doc. 23, at 5).

To establish an employee as a suitable comparator, the plaintiff must show the employee to be similarly situated to the plaintiff in "all relevant aspects." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006). For employees to be considered "similarly situated" under the fourth *McDonnell Douglas* prong, they "must have engaged in acts of comparable seriousness." *Id.* Courts examine such factors as whether the individuals dealt with the same supervisor, were subject to the same standards, and "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.*

9

Plaintiff argues younger employees have not been terminated for HIPAA violations, but approximately half the employees Defendant has terminated for HIPAA violations were younger than 40 years old at the time of their termination. (Doc. 20-23). From March 2007 through December 2008, Defendant terminated four employees for improperly accessing family members' appointments or medical records when they did not need the information to perform their jobs. (Doc. 20-4, at 72–73; Doc. 20-22). Three of those four employees were under 40 at the time they were terminated. (Doc. 20-4, at 72–73; Doc. 20-22). For example, Angel Wilson, 24, was terminated for accessing her family member's appointment information because of a "family ordeal." (Doc. 20-4, at 73; Doc. 20-23). Plaintiff suggests three employees younger than her were issued final written warnings rather than being terminated, and contends these situations were more similar to hers. (Doc. 23, at 5). However, one of these employees inadvertently accessed the patient's information, one used an old lab report as scrap paper, and one called a patient's wife because she was listed as the patient's emergency contact. (Doc. 27-1).

Plaintiff deliberately accessed family members' medical information when it was not required to perform her job. Regardless of age, individuals who intentionally accessed family member information not required to do their jobs were terminated. (Doc. 20-4, at 72–73; Doc. 27-2). Further, most of the individuals not terminated for HIPAA violations were older than 40 at the time and therefore fall within ADEA's protected class. (Doc. 27-1; 27-2). Plaintiff cannot establish Defendant treated her less favorably than younger, similarly situated employees. For those reasons, she has not established a prima facie case of age discrimination.

*Defendant's Legitimate, Nondiscriminatory Reason*

Even if Plaintiff had been able to establish her prima facie case, that would merely shift a

burden of production onto Defendant to articulate a legitimate, nondiscriminatory business reason for terminating Plaintiff's employment. *Provenzano*, 663 F.3d at 812. And it is not unlawful for an employer to discharge an employee when it had good cause. 29 U.S.C. § 623(f)(3). Defendant terminated Plaintiff's employment for her numerous violations of HIPAA and its confidentiality policies. As Plaintiff acknowledged many times, Defendant's policies prohibited her from accessing patient information not required to perform her job. (Doc. 20-6; Doc 20-7; Doc 20-9; Doc. 20-10; *see* Doc. 20-1, at 31–38). Even if she had power of attorney for her mother or guardianship over her sister, she still needed to go through a medical records request to access the information. (Doc. 20-4, at 22). A HIPAA release form only authorizes the agent to execute an authorization to release medical records on the individual's behalf – not to personally access the information themselves on hospital computers. (*See* Doc. 23-1, Appendix 5, at 7).

Once Plaintiff acknowledged she had not needed her mother's or sister's medical information to perform her job (Doc. 20-1, at 77), a violation was established. In fact, multiple violations were established, as records showed Plaintiff had improperly accessed her mother's records a number of times. (Doc. 23-3, at 21). Defendant's confidentiality policies permit discipline up to and including termination for such violations, as Plaintiff acknowledged numerous times. Further, the corrective action policy allows management to bypass any steps in the disciplinary process at its discretion. (Doc. 20-13, at 2). Defendant has satisfied its burden of production by showing it terminated Plaintiff for a legitimate, nondiscriminatory reason: HIPAA and confidentiality policy violations.

*Plaintiff's Pretext Argument*

At all times, the ultimate burden of persuasion remains on Plaintiff to prove age was the but-for cause of her termination. *Gross*, 129 S. Ct. At 2351. As Defendant satisfied its burden to

11

articulate a legitimate, nondiscriminatory reason for its adverse employment action, the burden shifts back to Plaintiff to show Defendant's proffered reason is merely a pretext to mask discrimination. *Provenzano*, 663 F.3d at 812. This can be shown three ways. Plaintiff can show Defendant's proffered reason (1) had no basis in fact, (2) did not actually motivate its action, or (3) was insufficient to motivate the action. *Harris v. Metro. Gov't of Nashville and Davidson County*, 594 F.3d 476, 486 (6th Cir. 2010).

Plaintiff cannot show pretext under the first theory because Defendant's proffered reason certainly had a factual basis – Plaintiff did in fact violate the confidentiality policy on numerous occasions. She cannot show pretext under the second theory because Defendant took no adverse employment action until Plaintiff confirmed she had in fact improperly accessed patient records. (Doc. 20-15, at 9). Plaintiff supports her pretext argument by claiming Defendant's reasons for terminating her employment were insufficient. (Doc. 23, at 6–7).

Plaintiffs may show insufficiency – and by extension, pretext – by offering evidence the defendant-employer had never before discharged an employee for the same conduct. *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 373. In this case, no evidence establishes that. In fact, evidence indicates the opposite. Multiple employees were discharged violating HIPAA and the confidentiality policy – the same reasons as Plaintiff. (Doc. 27, at 2; Doc. 27-2).

Insufficiency may also be established with evidence showing "that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Rutherford v. Britthaven, Inc.*, 2011 U.S. App. LEXIS 25806, at *10 (6th Cir. 2011). Evidence does not establish this, either. Most of the employees *not* terminated for HIPAA violations

12

actually fall within the protected class (Doc.20-22; Doc. 27-1; Doc. 27-2), and every employee who improperly accessed family medical files was terminated regardless of their age. (Doc. 27-2). A plaintiff's "own subjective view" that her prior job performance made termination irrational does not suggest age was the but-for cause of her termination when she repeatedly breached Defendant's confidentiality policy. *See Green v. Fid. Invs.*, 374 Fed. App'x. 573, 575–77 (6th Cir. 2010).

Plaintiff argues she should not have been terminated because in 2007, her supervisor told her she could access her mother's stress test results. (Doc. 23, at 6). According to Plaintiff, her mother had a stress test performed in the cardiology department and asked Plaintiff about the results after several weeks without receiving them. (Doc. 20-1, at 46–47). Plaintiff's supervisor, Trapp, told Plaintiff she could look up the stress test results and relay the information to her mother. (Doc. 20-1, at 47). Critically, the stress test was performed by the cardiology department. As a cardiology department employee, Plaintiff would have been permitted to access any patient's stress test results if they asked her about them. (Doc. 20-5, at 37–38). In 2007 when she had the stress test, Plaintiff's mother was a patient of the cardiology department. It was simply a coincidence that she happened to be Plaintiff's mother as well. (Doc. 20-5, at 38). Plaintiff was permitted to access her mother's stress test result because it was required to perform her job. That is, a cardiology department patient asked about test results and Plaintiff's job required her to answer. This did not give Plaintiff permission to access her mother's unrelated medical records, and certainly did not give her permission to access her sister's medical records unless she needed the information to perform her job.

No evidence suggests Defendant fired Plaintiff because of her age and used the HIPAA violation as a pretext to mask impermissible discrimination. Lancaster did not even know Plaintiff's

13

age at the time of termination (Doc. 20-4, at 76–77), and Hammer only knew Plaintiff's age because he had examined her personnel file as human resources director so he could consult with local counsel to ensure Defendant conducted the termination properly. (Doc. 20-15, at 7). Plaintiff violated Defendant's policy and HIPAA, and Defendant treated Plaintiff just like everyone else who improperly accessed family medical records. Plaintiff has not established a genuine issue of material fact and has not shown sufficient evidence from which a jury could reasonably find for her. *See Anderson*, 477 U.S. at 249. Therefore, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's ADEA claim.

<u>Disability Discrimination Claim</u>

The ADA prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). In this case, Plaintiff alleges Defendant discriminated against her based on her association with her sister, who has Downs Syndrome. (Doc. 1-1, at 7; Doc. 20-1, at 12). These "association discrimination" claims fall under one of three theories. *Stansberry v. Air Wisconsin Airlines Corp.*, 2011 U.S. App. LEXIS 13659, at *9-10 (6th Cir. 2011).

The first theory – an expense theory – covers employees subjected to adverse employment actions based on an "association with a disabled individual covered under the employer's health plan, which is costly to the employer." *Id.* at *10. In the second theory – disability by association – plaintiffs have suffered an adverse employment action based on an employer's fear its employee may contract a disability, either directly from the person with whom the employee is associated (i.e., HIV) or due to a genetic predisposition to develop the same disabilities the employee's relatives

14

have. *Id.* The third association discrimination theory – distraction theory – covers discrimination against an employee who is "somewhat inattentive at work because of the disability of someone with whom he or she is associated." *Id.* Plaintiff appears to bring her ADA claim under the distraction theory. *See* (Doc. 1-1, at paragraph 7).

In *Stansberry*, the Sixth Circuit adopted Title VII's *McDonnell Douglas* burden shifting analysis for associational discrimination claims.  2011 U.S. App. LEXIS 13659 at *11. Like all *McDonnell-Douglas*-based tests, the plaintiff must first establish a prima facie case, which shifts a burden of production to the defendant to articulate a legitimate, nondiscriminatory reason for the action, after which the plaintiff must show the proffered reason is a pretext to mask discrimination. *See id.* at *10–15.

*Plaintiff's Prima Facie Case*

To establish a prima facie case, Plaintiff must establish four elements: (1) She was qualified for the position; (2) she was subject to an adverse employment action; (3) she was known to be associated with a disabled individual; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the relative's disability was a determining factor in the decision.  *Id.* at *11–12. Defendant argues Plaintiff cannot establish the third and fourth prongs of her prima facie case.

<u>*Knowledge of Association with a Disabled Individual*</u>

Plaintiff has not provided evidence showing she was known to be associated with a disabled person. Lancaster and Hammer both testified they had no knowledge Plaintiff's sister has Downs Syndrome. (Doc. 20-4, at 77); (Doc. 20-15, at 41). Plaintiff testified that prior to her termination meeting, she had never discussed her disabled sister (or anything else, for that matter) with

15

Lancaster. (Doc. 20-1, at 81–82). She could not recall if Hammer had been involved in a conversation about putting her sister on her health insurance. (Doc. 20-1, at 81–82). While she did discuss her sister's disability with co-workers and the physicians in her department, Plaintiff testified she had no knowledge whether they had relayed the information to Lancaster or Hammer. (Doc. 20-1, at 92–93).

Plaintiff contends genuine issues of material fact exist regarding Defendant's knowledge of her association with a disabled person because Plaintiff indicated her sister was disabled at the termination meeting. (Doc. 23, at 8). All parties agree, however, that the termination paperwork had already been prepared and was on the table during the meeting. (Doc. 20-4, at 19; Doc. 20-1, at 108). Further, though Plaintiff suggests otherwise, Hammer did not testify that no disciplinary decision had been made until the meeting. Rather, he testified Plaintiff was allowed to give her side of the story. (Doc. 20-15, at 7). Once Plaintiff gave her side of the story, it was clear she had violated Defendant's policies and HIPAA and the termination paperwork was executed. (Doc. 20-15, at 9). Because Plaintiff has offered no evidence showing Defendant knew she was associated with a disabled individual, she cannot satisfy the third prong of her prima facie case.

### *Reasonable Inference Disability was a Determining Factor*

Even if Plaintiff could show Defendant knew she was associated with a disabled individual, she cannot establish the fourth prong of her prima facie case. The circumstances do not raise a reasonable inference that her sister's disability was a determinative factor in Defendant's decision to terminate her employment. *See Stansberry*, 2011 U.S. App. LEXIS 13659 at *11–12. Where there is evidence a plaintiff is not satisfactorily performing his or her job, there is no reasonable inference that an associational disability is a determining factor in termination decisions. *See id.* at *13–16

16

(affirming summary judgment for defendant where evidence showed the plaintiff was not performing satisfactorily, even though his wife's condition worsened immediately prior to termination and his poor job performance was likely related to his wife's illness). Plaintiff violated Defendant's confidentiality policy, providing a legitimate, nondiscriminatory reason to terminate her. This does not raise an inference that her sister's disability was a determining factor in Defendant's decision to terminate Plaintiff.

Plaintiff additionally argues circumstances raise a reasonable inference that her sister's disability was a determining factor because some of her physician-supervisors complained about her sister's disability distracting her from her work. (Doc. 23, at 9). However, even if these physicians had concerns, Plaintiff provides no evidence they conveyed these concerns to the decision-makers in this case. Hammer testified he had no knowledge of any physician concerns regarding Plaintiff. (Doc. 20-15, at 37). Plaintiff's supervisor testified she did not share any information regarding Plaintiff's family with Hammer or Lancaster. (Doc. 20-5, at 41). She further testified that the decision to terminate Plaintiff was taken completely out of the cardiology department's hands, meaning the physicians played no role in it. (Doc. 20-5, at 44). Even Plaintiff herself indicates she does not know whether any of the physicians relayed their concerns to the decision-makers. (Doc. 20-1, at 92–94).

Because Plaintiff violated Defendant's policies and has not shown evidence raising a reasonable inference that her sister's disability at all influenced – let alone was a determining factor in – the decision to terminate her, she cannot satisfy the fourth prong of her prima facie case.

*Defendant's Legitimate, Nondiscriminatory Reason*

Even if Plaintiff could establish her prima facie case, she would merely shift a burden of

17

production to Defendant. For the reasons discussed under the ADEA analysis, Defendant articulated a legitimate, nondiscriminatory reason for Plaintiff's employment: her multiple HIPAA and confidentiality policy violations. This satisfies Defendant's burden of production and shifts the burden back to Plaintiff to demonstrate pretext.

*Plaintiff's Pretext Argument*

Like under the ADEA, a plaintiff can show a defendant's proffered reason is pretext for disability discrimination by showing it (1) has no basis in fact, (2) did not actually motivate its decision, or (3) was never used in the past to discharge an employee. *Taylor v. Art. Iron, Inc.*, 2002 U.S. Dist. LEXIS 17557, at *35–36 (N.D. Ohio 2002). The plaintiff "must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions." *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 883 (6th Cir. 1996). Plaintiff did violate Defendant's policy, and Defendant terminated her employment as soon as Plaintiff failed to provide evidence she had not violated the policy. (Doc. 20-4, at 19). The policy permitted disciplinary action up to and including termination. (Doc.20-10; Doc. 20-1, at 32). Additionally, every employee who improperly accessed a family member's medical records was terminated regardless of age. (Doc. 27-2). Plaintiff has not provided any evidence Defendant merely used her multiple policy violations as a pretext to terminate her employment because of her sister's disability. The Court therefore grants Defendant's Motion for Summary Judgment on Plaintiff's associational discrimination claim.

Intentional Infliction of Emotional Distress Claim

To establish her claim for IIED under Ohio law, Plaintiff must prove (1) Defendant acted intending to cause emotional distress (or knew or should have known its actions would result in serious emotional distress) to Plaintiff, (2) Defendant's conduct was so extreme and outrageous as

18

to go beyond all possible bounds of decency, (3) Defendant's actions proximately caused Plaintiff's psychic injury, and (4) Plaintiff's mental anguish is "serious and of a nature that no reasonable [person] could be expected to endure it." *Kimmel v. Lowe's, Inc.*, 2011 Ohio 28, ¶ 13 (Ohio Ct. App. 2011) (internal citations omitted). "To say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999). A claim fails when based on "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 375 (1983). Indeed, courts only find liability where the defendant's conduct is regarded as "atrocious, and utterly intolerable in civilized community." *Id.*

Plaintiff clarified the basis for her IIED claim in her deposition. (Doc. 20-1, at 130, 140–42). Plaintiff stated Defendant terminated her employment without offering her a disciplinary process, told her she "could not set foot" on Defendant's grounds, and could not apply for a job in the ProMedica Healthcare System – leaving her few places in the Toledo area to apply for work as a nurse. (Doc. 20-1, at 130).

Defendant's corrective action policy reserves to management the right to bypass steps in its disciplinary process (Doc. 20-13, at 2), and Plaintiff acknowledged that any confidentiality policy violation could result in discipline up to and including termination. (Doc. 20-1, at 31–32; Doc. 20-10). Thus, Defendant did not engage in extreme or outrageous behavior by terminating her for violating the policy. Furthermore, "every Toledo Clinic employee terminated for a HIPAA violation . . . is informed that he/she may only step foot on Toledo Clinic property as a patient or in support of a patient, such as a family member." (Doc. 27-4). It is a requirement Defendant applies to all involuntarily terminated employees. (Doc. 27-4). And Defendant was also simply following its

19

policies by informing Plaintiff she could never work for ProMedica again. (Doc. 20-4, at 22-23). Termination alone – even when actually based on discrimination – does not constitute extreme and outrageous conduct unless the plaintiff can prove something more. *Godfredson*, 173 F.3d at 376. Otherwise, every discrimination claim would automatically become an IIED action. *Id.* Defendant merely applied its policies to Plaintiff the same way it applies them to every terminated employee, and Plaintiff certainly cannot show this conduct was "atrocious, and utterly intolerable in civilized community." *Yeager*, 6 Ohio St.3d at 375.

Even if Plaintiff could show extreme and outrageous conduct on Defendant's part, she would still have to show her injury is severe enough to establish an IIED claim. To do so, Plaintiff must show that a reasonable, normally constituted person would be unable to cope adequately with the mental distress generated by the case's circumstances. *Godfredson*, 173 F.3d at 376. Here, Plaintiff cannot establish a severe enough psychic injury. She states she has lost confidence, feels like a failure, has trouble sleeping, and has dreamt about the event. (Doc. 20-1, at 140). Although she was prescribed Zoloft for panic attacks, she never sought psychiatric treatment for her alleged injuries. (Doc. 20-1, at 141). Additionally, despite her alleged trouble sleeping, Plaintiff never sought professional help  for her sleep issues. (Doc. 20-1, at 140).

To establish an IIED claim, Plaintiff must show her mental anguish is so serious no reasonable person could be expected to endure it. *Kimmel*, 2011 Ohio 28 at ¶ 13. "The term 'serious' goes beyond a trifling mental disturbance, mere upset, or hurt feelings, as it describes an emotional injury which is both severe and debilitating." *Godfredson*, 173 F.3d at 376 (quoting *Reynolds v. Wingers, Inc.*, 86 Ohio App. 3d 742, 748 (1993)). Plaintiff's conditions are similar to those at issue in *Godfredson* (upset stomach, loss of sleep, and financial concerns). *See id.* at 376. Like the

conditions Godfredson experienced after being fired, Plaintiff's conditions do not meet the level of seriousness or severity required for an IIED claim.

Because Plaintiff cannot show Defendant engaged in extreme and outrageous behavior beyond all possible bounds of decency when it terminated her employment after she violated its confidentiality policy, and because even if she could, Plaintiff cannot establish a severe enough emotional injury, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's IIED claim.

Negligent Hiring, Retention, and Supervision Claim

To establish her claim of negligent hiring, retention, and supervision under Ohio law, Plaintiff must demonstrate (1) the existence of an employment relationship, (2) the employee Defendant negligently hired or retained was incompetent, (3) Defendant had actual or constructive knowledge of the employee's incompetence, (4) the negligently hired or retained employee's act or omission caused Plaintiff's injuries, and (5) Defendant's negligence in hiring or retaining the employee proximately caused Plaintiff's injuries. *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St. 2d 66, 69 (1982). Absent an underlying act of negligence by the employee who allegedly caused her injury or loss, Plaintiff cannot establish her claim. *Lehrner v. Safeco Insurance/American States Ins. Co.*, 171 Ohio App. 3d 570, 583 (2007).

During her deposition, Plaintiff testified she intends to direct her negligent hiring, retention, and supervision claim at Lancaster. (Doc. 20-1, at 103–04). Specifically, Plaintiff argues Lancaster was incompetent in HIPAA, privacy law, and confidentiality policy training and alleges this incompetence caused Lancaster to improperly terminate Plaintiff's employment. (Doc. 20-1, at 103–04). Plaintiff also suggests the following: Lancaster's investigation into the reported privacy

21

violation should have been more thorough; Plaintiff should have been more involved in the investigation; and Plaintiff should have been provided progressive discipline rather than being terminated. (Doc. 20-1, at 104–05, 111–12).

Lancaster has received abundant training in HIPAA and privacy compliance. She has worked for Defendant since 1977 and has served as privacy and compliance officer since 2003. (Doc. 20-4, at 7–8). In addition to receiving HIPAA training when the law first went into effect, she has attended seminars and has gone to educational sessions with legal counsel, and she continues to receive training on an ongoing basis. (Doc. 20-4, at 8). This long history of training shows she was competent in privacy law compliance issues. Further, the record reflects no previous complaints about Lancaster's competence in the areas under her supervision. At the very least, the lack of complaints and Defendant's efforts to continually train Lancaster on privacy law show Defendant had no actual or constructive knowledge of incompetence, meaning it could not have negligently retained her in the position.

Furthermore, despite Plaintiff's assertions, Lancaster's investigation into Plaintiff's reported policy violations was thorough enough to detect Plaintiff's multiple violations of the confidentiality policy. Upon receiving the anonymous complaint about Plaintiff, Lancaster investigated the computer records and discovered Plaintiff had accessed her mother's and sister's medical records numerous times. (Doc. 20-4, at 12–13; Doc. 23-3). In fact, the investigation revealed Plaintiff had accessed her mother's records at least 44 times and her sister's records at least 28 times, without authorization. (Doc. 23-3, at 21). Lancaster confirmed Plaintiff's mother and sister were not cardiology department patients (Doc. 20-4, at 12), and Lancaster investigated further and found no guardianship papers, HIPAA releases, or power of attorney documents that would have allowed Plaintiff to request access

22

to the medical records. (Doc. 20-4, at 12–13; Doc. 27-3). At the meeting with Plaintiff, Plaintiff admitted she had not needed to access the records for her job. (Doc 20-1, at 30, 77). Once Lancaster discovered Plaintiff had improperly accessed patient information, the situation needed no further investigation or involvement from Plaintiff. A confidentiality policy and HIPAA violation had been established.

Regarding Plaintiff's claim that Lancaster is incompetent because she did not recommend progressive discipline, Defendant's policy prohibiting employees from accessing patient medical records other than as required to perform their jobs provides for discipline up to and including termination. (Doc. 20-10; Doc. 20-1, at 32). The disciplinary process allows management to bypass any steps in progressive termination at their discretion. (Doc. 20-13). Lancaster was well within the bounds of competence in her job and well within the bounds of permitted disciplinary action by terminating Plaintiff's employment rather than issuing lesser discipline.

Because Plaintiff has not shown Lancaster committed an underlying act of negligence in the circumstances that led to her termination, *Lehrner*, 171 Ohio App. 3d at 583, because Plaintiff cannot show Lancaster incompetently performed her job as privacy and compliance officer, and because in any event, no evidence shows Defendant had actual or constructive knowledge of any supposed incompetence, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's negligent hiring, retention, or supervision claim.

Defamation Claim

To establish her defamation claim under Ohio law, Plaintiff must prove (1) a false and defamatory statement made about her, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on Defendant's part, and (4) either actionability of the statement

23

irrespective of special harm or the existence of special harm caused by the publication. *Akron-Canton Waste Oil v. Safety-Kleen Oil Servs.*, 81 Ohio App. 3d 591, 601 (Ohio Ct. App. 1992). As defamation claims require, before anything else, proof of a false and defamatory statement about the plaintiff, truth is a well-established and absolute defense. Ohio Rev. Code § 2739.02; *Ed Schorey & Sons v. Francis*, 75 Ohio St. 3d 433, 445 (1996).

Plaintiff alleges persons associated with Defendant made false, unprivileged statements regarding her termination to third parties. (Doc. 1-1, at paragraph 26; Doc. 20-1, at 118–124). However, Plaintiff submits no proof any person associated with Defendant made a statement regarding her termination to anyone. As evidence, she points to former co-workers' statements to her several months after her termination. Both co-workers had heard from other co-workers that Plaintiff was fired for a HIPAA violation. (Doc. 20-1, at 118). As Plaintiff claims to have told only her husband and brother the reason for her termination, she believes this shows there "had obviously been a leak from the office". (Doc. 20-1, at 118). Plaintiff does not identify who she believes made a statement, what the person said, or when the person said it (Doc. 20-1, at 119), and no deposition testimony from Defendant's employees indicates who may have made a statement regarding Plaintiff's termination.(*See* Doc. 20-4, at 74–75; Doc 20-15, at 20).

Plaintiff asks this Court to consider the argument that a defendant may be liable for defamation when it knew or should have known the plaintiff would have to repeat its defamatory statement. (Doc. 23, at 13–15). No Ohio court, however, "has yet embraced the idea that an alleged victim of defamation can satisfy the publication element of the tort by publishing it himself, i.e. to prospective employers." *Guy v. McCartney*, 2002 Ohio 3035, ¶ 35 (Ohio Ct. App. 2002). Even if the Court applied the self-publication doctrine, Plaintiff would still have to prove that she self-published

24

false information to succeed with her claim, and she cannot prove falsity.

As Plaintiff points out, HIPAA does permit individuals to request access to their own health information so they may inspect and obtain a copy of it, and the law allows the same rights to those who serve as guardians or hold power of attorney. *See* 45 C.F.R. §§ 164.524(a), 164.502(g). But HIPAA says nothing about allowing such people to directly access the information themselves on hospital computers. Plaintiff admits knowing the appropriate process for requesting medical records and in fact followed this process after her termination. (Doc. 20-1, at 28–29; *see* Doc. 23-1). Further, Defendant's policy clearly prohibits employees from accessing any medical information not required to perform their job duties – allowing discipline up to termination for violations – and Plaintiff acknowledged this policy on numerous occasions. (Doc. 20-6; Doc 20-7; Doc 20-9; Doc. 20-10; Doc 20-12). When Lancaster asked why Plaintiff had accessed her mother's and sister's medical information, Plaintiff admitted she did not need the information to perform her job duties (Doc 20-1, at 77).

Plaintiff plainly violated Defendant's policy by accessing her mother's and sister's medical records when it was not related to her job, and this resulted in her termination. Thus, even if Plaintiff could show a statement was made by any individual associated with Defendant (or even if she had to repeat the information herself), the words would merely have stated the true reason for Plaintiff's termination. This is a complete defense to the defamation claim. *See Green v. Fid. Invs.*, 374 Fed. App'x 573, 578 (6th Cir. 2010) (affirming summary judgment for the defendant where an allegedly defamatory statement merely stated the substantively true reason for an employee's termination). The Court therefore grants Defendant's Motion for Summary Judgment on Plaintiff's defamation claim.

25

<u>Invasion of Privacy Claim</u>

Plaintiff asserts a claim for invasion of privacy under two theories: portrayal in a false light and intrusion into her private affairs. (Doc. 23, at 15, 16).

*False Light*

For Plaintiff to establish a claim for invasion of privacy under a false light theory, "[f]irst, the statement made must be untrue." *Welling v. Weinfeld*, 113 Ohio St. 3d 464, 471 (2007). Second, the information must be "publicized," which differs from "publication" in the defamation context. *Id.* "Publication" includes any communication by the defendant to a third party, while a statement is "publicized" only when the matter has been made public "by [the defendant] communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become public knowledge." *Id.* Finally, (1) the false light in which the plaintiff was placed must be highly offensive to a reasonable person, and (2) the defendant must have known or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed. *Id.* at 473.

Plaintiff bases her false light invasion of privacy claim on the same premise as her defamation claim. (Doc. 20-1, at 124–25). Like Plaintiff's defamation claim, Plaintiff cannot establish a claim for false light invasion of privacy because any statements made were substantively true. Plaintiff alleges Defendant made malicious false statements pertaining to her (Doc. 23, at 15–16) when in fact, no evidence shows Defendant made any statements pertaining to her, and if it did, Defendant merely stated the truth: Plaintiff was fired for violating the confidentiality policy and HIPAA. *See Christiansen v. Pricer*, 2010 Ohio 2718, ¶ 56–58 (Ohio Ct. App. 2010) ("statements did not place

26

appellant in a false light, given that the statements were literally true."). Further, while a few hospital workers may have discovered the reason for Plaintiff's termination, this hardly counts as "the public at large" or as "so many persons that the matter must be regarded as substantially certain to become public knowledge." *Welling*, 113 Ohio St. 3d at 471.

*Intrusion into Private Affairs*

To establish her claim for invasion of privacy based on intrusion into private affairs, Plaintiff must show (1) the area intruded on was private and (2) the intrusion was unwarranted and would be offensive or objectionable to a reasonable person. *Miller v. Cincinnati Children's Hosp. Med. Ctr.*, 2006 Ohio App. LEXIS 3837, at **8 (Ohio Ct. App. 2006).

To support her claim, Plaintiff alleges one of the doctors who worked with her and supervised her performance, Dr. Nahhas, discussed her personal relationships – namely, the situations with her mother and sister. (Doc. 20-1, at 126). From around the time Plaintiff obtained guardianship of her sister in 2008 until the time she was terminated in March 2010, Nahhas asked Plaintiff to have lunch with him fewer than ten times, and at these lunches he would discuss her family situation with her, though he never discussed his own family. (Doc. 20-1, at 126–27). Nahhas already knew there were problems with Plaintiff's mother, and he knew about issues between Plaintiff's mother and sister because she had "probably discussed the changing guardianship" with him. (Doc. 20-1, at 127). Knowing the situation, Nahhas would ask Plaintiff how things were going and how her mother was doing. (Doc. 20-1, at 128). This, Plaintiff claims, was an unwarranted intrusion into a private area and would be offensive or objectionable to a reasonable person. (Doc. 23, at 16).

In *Miller*, the plaintiff brought an invasion of privacy claim against her employer alleging her former supervisor made comments within the scope of employment concerning her "care of her

27

infant granddaughter and her work performance as it was affected by her responsibilities for her granddaughter." 2006 Ohio. App. LEXIS 3837 at **2. Miller's granddaughter had recently undergone a heart transplant, a situation receiving media attention in which Miller actively participated. *Id.* at **3. Miller sought guardianship of and eventually adopted her granddaughter. *Id.* Complaints began to circulate about Miller's work performance after she started "teleworking" to manage her responsibilities for her granddaughter, so her supervisor discussed these issues with Miller in weekly meetings. *Id.* at **3–4.

Affirming summary judgment for the defendant, the Ohio Court of Appeals found Miller's media involvement concerning her granddaughter had made the area no longer private because the record failed to reflect evidence she had ever declined to discuss the child's progress. *Id.* at **8. Further, it found Miller's supervisor had acted within the scope of his supervisory duties in discussing Miller's struggles to manage her job. *Id.* at **8–9. Even if not every comment about Miller's granddaughter was supervisory, "[e]vidence that [he] had acted within the scope of his supervisory duties, coupled with Miller's own publication of her granddaughter's condition" showed there had been no intrusion into a private area. *Id.* at **9.

Like Miller, Plaintiff discussed the information regarding her family problems with others at work, making it no longer a private area for purposes of her invasion of privacy claim. While Plaintiff never sought media attention, Nahhas already knew about the issues with her mother and sister because she had discussed changing guardianship with him. (Doc. 20-1, at 127). Additionally, deposition testimony from Plaintiff's direct supervisor, Trapp, indicated Plaintiff gave co-workers "many details about her mother and her sister and her family issues" and "went on a lot about different things", including her attempts to get guardianship of her sister. (Doc. 20-5, at 29–30).

28

Further, Plaintiff indicated she never asked Nahhas to stop asking her about her family or told him he made her uncomfortable by asking about her family. (Doc. 20-1, at 128).

Because Plaintiff told Nahhas about her attempts to get guardianship of her sister (even before their lunches) and gave details at work about her family issues, Plaintiff herself published her family information to others and cannot show Nahhas intruded on a private area by asking her about her family. And like Miller's supervisor inquiring about her granddaughter due to concerns about Miller's ability to handle her workload, it was within Nahhas's supervisory duties to discuss Plaintiff's family if he believed it was negatively impacting her ability to perform her work.(*See* Doc. 20-1, at 87–88) (Plaintiff discusses a conversation with Nahhas regarding her work performance and the way her responsibilities for her sister impacted it); (*see* Doc. 20-5, at 16) (Trapp says the doctors were concerned about having enough coverage for their patients, but never prevented Plaintiff from taking time off to care for her family).

Even if not every conversation Nahhas had with Plaintiff about her family was supervisory, evidence that it was in the scope of his duties, coupled with Plaintiff's own publication of her family issues to Nahhas and other co-workers, shows there has been no intrusion into a private area. *See Miller*, 2006 Ohio. App. LEXIS 3837 at **9. Because Nahhas's comments did not intrude upon Plaintiff's private affairs, the Court need not address whether they would have offended a reasonable person. *See id.* The Court grants Defendant's Motion for Summary Judgment on Plaintiff's invasion of privacy claim.

## CONCLUSION

Because no genuine issues of material fact exist on any of Plaintiff's claims, and because Defendant is entitled to judgment as a matter of law on each claim, the Court grants Defendant's

29

Motion for Summary Judgment. The case is dismissed.

       IT IS SO ORDERED.

                                                                                                ___s/James R. Knepp II____

                                                                             United States Magistrate Judge